# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LOUISE THOMPSON,**

    **Plaintiff,**

v.                                                            Case No.  6:08-cv-2052-Orl-35DAB

**ENERGIZER HOLDINGS, INC. and
ENERGIZER PLANS ADMINISTRATIVE
COMMITTEE,**

    **Defendants.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Plaintiff Louise Thompson's Motion for Partial Summary Judgment on Wages, Vacation Pay, and Bonus (Dkt. 39); Defendant Energizer Holdings Inc. and Defendant Energizer Plans Administrative Committee's (collectively "Defendants'") Response in opposition thereto (Dkt. 47); Plaintiff's Reply (Dkt. 49); Defendants' Motion for Summary Judgment (Dkt. 48); Plaintiff's combined Cross Motion for Summary Judgment and Response in Opposition to Defendants' Motion (Dkt. 51); and Defendants' Reply and Response in Opposition thereto.  (Dkts. 52, 53)   Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **DENIES** Plaintiff's Motions (Dkts. 39, 51) and **GRANTS in part** and **DENIES in part** Defendants' Motion (Dkt. 48), as described herein.

I.  **BACKGROUND**

   A. **Case History**

This case arises out of Defendants' alleged refusal to compensate properly Plaintiff via wages, vacation pay, and bonus pursuant to the terms of her Employment Agreement and Defendants' denial of severance pay to Plaintiff under the Change In Control Severance Plan (the "Plan") established and sponsored by Defendants' predecessor, Playtex Products, Inc. ("Playtex").  (Dkt. 32-1 at 2; Dkt. 48-2 at 16-45) Plaintiff has moved for summary judgment on her breach of contract claim, alleging Defendants failed to pay her an $85,000.00 per year contractual rate and failed, upon her separation from employment, to pay her for vacation pay and bonus.  (Dkt. 39 at 3-7)  In response and in their cross motion for summary judgment, Defendants contend Plaintiff's breach of contract claim fails because she did receive all of the wages, bonus, and vacation pay due her.  (Dkt. 47 at 6-9; Dkt. 48 at 11-14; Dkt. 52 at 1-2)  Further, Defendants contend Plaintiff is not entitled to severance pay because the Severance Plan b which Plaintiff was governed, classified her as a "Tier III" employee, and , as defined, Tier III employees were only entitled to severance pay in the event of an involuntary termination.  Defendants contend, in this regard, that Plaintiff voluntary resigned.  (Dkt. 48 at 7-10)

   B. **Undisputed Facts**

The following facts are undisputed:

Plaintiff, a Ph.D. graduate of the University of Dundee, Scotland, was employed by Tanning Research Laboratories ("TRL") from April 2005 until April 2007.  (Dkt. 39-2

2

at 2, 5; Dkt. 47-3 at 2)  TRIL is a division of Hawaiian Tropic, Inc. and is located in Ormond Beach, Florida.  (Id.; Dkt. 39-2 at 40-41)  At TRIL, Plaintiff researched and evaluated the effectiveness of sun screening lotions.  (Dkt. 39-2 at 41; Dkt. 39-3 at 16-20; Dkt. 47-3 at 6)  She was initially hired as a part-time chemist and earned an hourly salary of $18.00 per hour.  (Dkt. 39-2 at 4; Dkt. 47-3 at 4; Dkt. 47-2 at ¶ 3)  In January 2006, Plaintiff was hired as a fulltime employee as a Scientific and Regulatory Affairs Manager.  (Dkt. 39-2 at 42; Dkt. 47-2 at 2; Dkt. 47-3 at 4)  Plaintiff earned approximately $40,000.00 per year in this position.  (Id.)

In April 2007, Playtex purchased TRIL.  (Dkt. 39-3 at 3; Dkt. 47-2 at 2)  On June 12, 2007, Playtex offered Plaintiff the position of Manager, Regulatory Affairs at an annualized base salary of $41,600.00, plus bonus incentives.  (Dkt. 47-3 at 8)  On October 1, 2007, Energizer Holdings, Inc. ("Energizer") acquired Playtex.  (Dkt. 39-3 at 21; Dkt. 47-2 at ¶ 8)  On December 5, 2007, Energizer offered Plaintiff a fulltime position as Science and Intellectual Property Manager in its Personal Care Division at a gross annual salary of $85,000.00, effective January 1, 2008.  (Dkt. 39-2 at 11; Dkt. 47-3 at 13)  Plaintiff signed and accepted the offer on December 18, 2007.  (Dkt. 39-2 at 12; Dkt. 47-3 at 14)

### *Wages and Bonus*

Contrary to the then existing agreement, effective January 1, 2008, Energizer paid Plaintiff at a lower wage rate than the agreed upon $85,000.00.  (Dkt. 47-2 at 5; Dkt. 47-4 at 24; Dkt. 49 at 3)  Specifically, Plaintiff was paid at an annual rate of $42,800 for January 1, 2008, through her last day of employment on April 31, 2008.  (Id.)

Plaintiff was also entitled to a bonus under the following provisions of her Employment Agreement:

> Effective January 1, 2008, you will no longer be eligible to participate in a bonus program.  However, due to loss of bonus participation, if you accept this offer you will receive a bonus reduction buyout payment on January 1, 2008 and January 1, 2009. Such payments will be calculated using the percentage reduction in your bonus target multiplied by your base salary in effect on December 31, 2007 for the January 1, 2008 payment and in effect on December 31, 2008 for the January 1, 2009 payment.  If you voluntarily terminate your employment or are terminated for cause during 2008, you must reimburse Energizer for the January 1, 2008 payment - - reduced on a prorated basis by completed month of service in 2008 - - and you forfeit entitlement to the January 1, 2009 payment.

(Dkt. 39-2 at 11)   Plaintiff's bonus target was determined by reference to her employment with Playtex before the Energizer acquisition:

> **Bonus Program:** Beginning January 1, 2008, you will be eligible to participate in the Playtex Products, Inc. incentive bonus plan with a target bonus of 15% of your annualized gross base salary.  Based on your position responsibilities, 100% of your bonus will be based on worldwide Playtex Value Measure results.  The 2007 Playtex Value Measure plan document is enclosed.

(Dkt. 39-2 at 9) (emphasis in original)   In addition to her salary, Plaintiff received the following gross payments: (1) $6,420.00 on January 15, 2008 (Dkt. 47-4 at 2); (2) $7,595.85 on May 15, 2008 (Dkt. 47-2 at 5; Dkt. 47-4 at 26); (3) $2,140.00 on September 25, 2008 (Dkt. 47-2 at 28; Dkt. 47-2 at ¶ 25); (4) $149.18 on May 15, 2008 (Dkt. 47-2 at ¶ 26; Dkt. 49 at 7); and (5) $169.29 on September 25, 2008.  (Dkt. 47-2 at ¶ 26; Dkt. 47-4 at 28)

In a letter dated April 11, 2008, Plaintiff stated:

After much deliberation, I cannot consider relocation to New Jersey or even remain in my position in Ormond Beach for the following reasons:
**[1.] Professional Qualification** . . . .

>   **[2.] Role and Responsibilities** . . . .
>   **[3.] Job Description** . . . .
>   **[4.] HR Meeting May 2007** . . . .
>   [**5.] Relocation** . . . .
>   **[6.] Trying Allendale** . . . .
>   **[7.] Conclusion**- I am an honest, well qualified, intelligent, hard working and motivated employee with a passion for the application of science for the greater good of mankind.
>   . . .
>   I continue to be ignored, rejected and frankly disrespected.  My working environment and the situation is extremely unhealthy to the point of being "toxic". It is affecting my family.  I can no longer tolerate it or allow it to continue.
>
>   Although I have several options and avenues to bring this situation to a conclusion I am prepared to accept a severance package.  In good faith I accepted continued employment in Allendale [New Jersey] and saw it as a possible resolution.  Since that time my trust has been eroded to the point where this is no longer an option.
>   . . .
>   Unfortunately some of the company's management, for reasons best known to them, have either failed to recognize my potential, were intimidated by it, or have been pursuing personal agendas.  As a result I have basically wasted three years of my professional life.
>
>   I await your proposal for severance and respectfully request that this takes place as expeditiously as possible in order that I can start to repair my health and restore my previous congenial family relationships.

(Dkt. 39-2 at 21-22)   On April 28, 2008, Plaintiff was offered a Separation Agreement.

(Dkt. 47-4 at 14-22)  The Separation Agreement stated:

>   WHEREAS, COMPANY, after examining business needs, is reorganizing and integrating its wet-shave products and tampon, infant feeding and care, and sun protection businesses;
>   WHEREAS, as of 4/30/2008, COLLEAGUE'S position will be eliminated as part of the reorganization and integration[.]

(Dkt. 47-4 at 16)  Plaintiff did not sign the Agreement.  (Id. at 22)  Plaintiff's last day of employment was April 30, 2008.  (Dkt. 39-4 at 24; Dkt. 47-4 at 15)

5

*Severance Benefits*

The Change In Control Severance Plan provided eligible employees with certain compensation and benefits in the event the employee's position with Playtex was terminated in connection with a change in control, as defined under the Plan. (See Part II.B, infra, at 8-9) The amount of benefits to which an employee was entitled depended on the classification of the employee as a Tier One, Tier Two, or Tier Three Eligible Employee. (Dkt. 48-2 at 26)

On December 29, 2008, Plaintiff filed an initial ERISA administrative appeal and claim for benefits under Playtex's Change In Control Severance Plan. (Dkt. 48-3 at 30-35) In a letter dated March 12, 2009, Defendant Energizer Plans Administrative Committee ("Defendant EPAC") informed Plaintiff she was not entitled to benefits because as a Tier III Employee, Plaintiff was only entitled to severance benefits in the event of an involuntary termination. (Dkt. 48-3 at 40-41) In April 2009, Plaintiff notified Defendant EPAC that she was appealing its decision to deny benefits. (Dkt. 48-3 at 44-47) On July 6, 2009, Defendant EPAC informed Plaintiff that her administrative remedies had been exhausted and that its decision to deny Plaintiff severance benefits was final and binding. (Dkt. 51-4 at 1-5) Specifically, the denial letter stated: "[T]here is substantial evidence in the record - - including her letter of resignation - - that Thompson voluntarily resigned. Colleagues who voluntarily resign are not entitled to Severance Plan benefits." (Id. at 4) The letter also stated [Mary] "Molitor[1], who was in

---

[1] Mary Molitor is a Legal Assistant at Eveready Battery Company, Inc. (Dkt. 52-2 at ¶ 2) She prepared Plaintiff's Separation Agreement after receiving notice from the Manager of Human Resources for Energizer Personal Care that Louise Thompson resigned from her position with the company. (Id. at ¶ 3)

the midst of preparing numerous severance agreements in conjunction with the Schick/Playtex Integration, inadvertently used the template Schick/Playtex integration severance agreement to prepare Thompson's agreement." (Dkt. 51-4 at 3)

## II. LEGAL STANDARD AND ANALYSIS

### A. ERISA Standard

ERISA's civil enforcement statute does not identify the standard of review for claims for welfare benefits. See 29 U.S.C. § 1132. However, the United States Supreme Court has analogized review of ERISA welfare benefits claims with principles of contract law and trust law, instructing lower courts to look to the terms of the policy itself to determine the applicable standard of review. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 112-13 (1989). In light of Firestone, the Eleventh Circuit developed a six-part guide for review of an ERISA administrator's decision, instructing district courts to:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.

>  (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir.2004) (summarizing analysis set forth in HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993-95 (11th Cir.2001)) (footnotes omitted). As to the sixth step in this analysis, in Doyle, the Eleventh Circuit eliminated the heightened standard of review applicable when a conflict of interest is present, overruling its precedent to "the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard" and holding "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008). Regardless of the applicable standard of review, standard summary judgment considerations do not apply because ERISA benefits denial cases present unique considerations. Hert v. Prudential Ins. Co, of Am., 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009).

### B. Defendant EPAC's Plan

Defendant's Plan at issue in the instant litigation provides, "[e]ach Eligible Employee who incurs a Change in Control Termination . . . shall be a Participant and shall receive the benefits described in the Plan." (Dkt. 48-2 at 25) An "Eligible Employee" is defined as "a salaried Employee of the Company employed in the United States for whom the Company withheld income and employment taxes." A "Change in Control Termination" is defined as an "Eligible Employee's Involuntary Termination that occurs on or within one (1) year following the date of a change in control or a Tier One Eligible Employee's Good Reason

8

Resignation that occurs within one (1) year following the date of a Change in Control." (Dkt. 48-2 at 22) Under the Plan, involuntary termination is defined as "termination of an Eligible Employee's employment initiated by the Company for any reason other than cause, Permanent Disability, or death." (Id. at 23) Further, the Plan states:

> Each Participant under this Plan may contest only the administration of the Severance Benefits awarded by completing and filing with the Plan Administrator a written request for review in the manner specified by the Plan Administrator. No appeal is permissible as to a Participant's eligibility for or amount of the Severance Benefit, which are decisions made solely within the discretion of the Company, and the Committee acting on behalf of the Company.

(Dkt. 48-2 at 28-29)

### C. Whether Defendant EPAC's Plan is Governed by ERISA

In her cross motion for summary judgment, Plaintiff asserts two alternative arguments: (1) the "so-called ERISA Severance Plan is not an ERISA Plan at All[;]" and (2) "[i]f this is in fact an ERISA Severance Plan, Plaintiff is entitled to benefits." (Dkt. 51 at 13-19) As an initial matter, the Court notes that not all severance arrangements fall within the purview of ERISA. See Slamen v. Paul Revere Life Ins. Co., 166 F.3d 1102, 1104 (11th Cir. 1999) (recognizing an employee welfare benefit plan must meet certain requirements to fall within ERISA's scope); see also Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1214 (11th Cir. 1999) (noting that the hallmark of an ERISA benefit plan is that it requires an ongoing administrative program and some degree of implementation by the employer beyond mere intent to confer a benefit).

In Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), the Supreme Court discussed ERISA's applicability to severance plans. Fort Halifax, 482 U.S. at 7-8. At

9

issue was whether a Maine statute, which required a one-time severance payment to employees upon the closing of a poultry packaging and processing plant, was an ERISA plan and therefore pre-empted by ERISA. Id. at 6-7. The Supreme Court held the Maine statute was not pre-empted by ERISA, opining:

> The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan*. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

Id. at 12 (emphasis on original).

Plaintiff argues that Defendant EPAC's Plan is nothing more than a simple scheme for making lump-sum payments to employees analogous to the plan at issue Fort Halifax because Defendant EPAC "has no genuine discretion in determining the amount, timing, or form of the payments." (Dkt. 51 at 14) The Court disagrees. First, the Plan at issue in Fort Halifax did not involve a contractual employee benefit plan, such as the one in this case, which delineates employees among three groups and allocates severance benefits according to an employee's classification. Specifically, the Plan identifies three groups of employees: Tier One, Tier Two, and Tier Three. (Dkt. 48 at 25) Second, regarding

10

Defendant EPAC's ongoing obligations and administration, all three tiers of employees receive outplacement services upon a change in control termination. (Id. at 39, 44, 45) In addition to a lump-sum severance payment, a pro rata portion of the regular bonus, and the prior year's profit sharing contribution, Tier One employees receive other benefits requiring administration for two years following termination, including, inter alia, continued coverage under the company's medical and dental plans, use of a company car, the value of financial planning services, the value of health club reimbursement, and spousal and dependent care benefits until the commencement of employment with another employer. (Id. at 38-39) The Court finds these benefits cannot be paid in a single-lump sum fashion and require continued coordination and financial control. See Shahid v. Ford Motor Co., 76 F.3d 1404, 1409 (6th Cir. 1996) (concluding employer's plan was an ERISA plan because the plan entailed a substantial severance payment, professional re-employment assistance, continuance of medical and life insurance coverage for up to one year, and retirement grow-in provisions). Therefore, the Court finds that Defendant EPAC's Plan is an ERISA plan, and Plaintiff's claims for severance pay are subject to the federal subject matter jurisdiction of this Court. Accordingly, Plaintiff's Motion for summary judgment and her request to remand the severance pay issue to state court is **DENIED**.

### D. Whether Plaintiff is Entitled to Severance Pay Under Defendant EPAC's Plan

Both parties move for summary judgment on this issue of Plaintiff's entitlement to severance pay. (Dkt. 48 at 7-10; Dkt. 51 at 15-19) As discussed in Part II.B, supra, regardless of the applicable standard of review, the Court first examines whether Defendant EPAC's decision to deny benefits is wrong. See Doyle, 542 F.3d at 1356; see

also Glazer v. Reliance Standard Life Insu. Co., 524 F.3d 1241, 1246 (11th. Cir. 2008). "Wrong," as the Eleventh Circuit uses the term in ERISA cases, means "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo,* the court disagrees with the claims administrator's plan interpretation." Glazer, 524 F.3d at 1246. If the claims administrator's interpretation is "wrong," the Court then decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." Lee v. Blue Cross/Blue Shield of Ala.*,* 10 F.3d 1547, 1550 (11th Cir. 1994). If the claim's administrator's decision is right, the Court ends the inquiry and affirms the decision. See Glazer, 524 F.3d at 1246-47. After reviewing the administrative record, the Court cannot ascertain whether Defendant EPAC's benefits-denial decision is right or *de novo* wrong and concludes that even if Defendant EPAC's decision is wrong, substantial evidence supports the claim administrator's decision to deny benefits.

Plaintiff contends she was involuntarily terminated, and thus eligible for severance pay, when Defendant "Energizer decided to close its Ormond Beach, Florida sun products department effective April 30, 2008, and to transfer the department to Allendale, New Jersey." (Dkt. 51 at 15) To support her position, Plaintiff cites the Separation Agreement cover letter, dated April 28, 2008, which states, "[i]f you choose not to accept the offer, your employment will terminate on April 30, 2008[,]" and the Separation Agreement itself, which provides:

> WHEREAS, COMPANY, after examining business needs, is reorganizing and integrating its wet-shave products and tampon, infant feeding and care, and sun protection businesses;
> WHEREAS, as of 4/30/2008, COLLEAGUE'S position will be eliminated as part of the reorganization and integration[.]

12

(Dkt. 47-4 at 15, 16)  In deposition, Plaintiff testified that at the time she received the Separation Agreement, she believed the company was reorganizing and that her position was terminated.  (Dkt. 51-8 at 43-44)  Similarly, in her affidavit, Plaintiff attested:

> My last day of Work at Ormond Beach was April 30, 2008, the day I had been informed that the research and development part of the sun tan business was closing in Ormond Beach.  I turned down the severance pay offer from CEO David P. Hatfield . . . [and] was forced to leave my employment by Energizer on April 30, 2008.  I had no plans to resign.

(Dkt. 51-2 at ¶¶ 10, 11, 15)  Plaintiff also attested to several other employees receiving severance packages in conjunction with the closing of the Ormond Beach office.  (Id. at ¶ 14)  Plaintiff's alleged termination would qualify as a "Change in Control Termination" as defined by the Plan because (1) Defendant Energizer acquired Playtex in October 2007; (2) Defendant Energizer initiated Plaintiff's termination in April 2008, only six months after the change in control; and (3) Plaintiff's termination was initiated as part of a reorganization/reduction in the workforce, rather than for cause, permanent disability, or death.  (See Dkt. 48-2 at 22)  Thus, if Plaintiff was in fact involuntarily terminated as a result of her refusal to sign the Separation Agreement, Plaintiff would be entitled to severance benefits under Defendant Energizer's Plan.

However, there is also evidence in the record to support Defendants' contention that Plaintiff voluntarily resigned and is thus ineligible for severance pay under the Plan.  (Dkt. 48 at 7-10; Dkt. 53 at 10-17)  Defendants cite the following as evidence of Plaintiff's voluntary resignation:

(1) Plaintiff's February 29, 2008, letter to Mr. SaNogueira[2] stating, "If we cannot reach an acceptable accommodation and understanding I think it would be best for all concerned that we negotiate a full and fair structured severance package together[.]" (Dkt. 48-5 at 2);
(2) Plaintiff's April 11, 2008, letter to Mr. SaNogueira, which begins, "After much deliberation, I cannot consider relocation to New Jersey or even remain in my position in Ormond Beach[.]" (Dkt. 39-2 at 21); and
(3) The September 22, 2008, charge of discrimination Plaintiff filed with the EEOC in which she states, "By April 11, 2008, I resigned because it became unbearable for me to continue my employment with Energizer Holdings, Inc., resulting from the company's continued discrimination, harassment, and lack of work assignment."

(Dkt. 48-3 at 38) Further, Defendants assert the inclusion of "integration" and "reorganization" language Plaintiff's Separation Agreement was a clerical mistake. (Dkt. 53 at 13-14) Ms. Molitor, the legal assistant who prepared Plaintiff's Separation Agreement attested:

> On April 21, 2008, I received notice from the then Manager of Human Resources for Energizer Personal Care, Audrey Sledge, that Louise Thompson had resigned her position with the Company. I was advised that despite her resignation, the Company was willing to provide Ms. Thompson with a severance package. At the time of Ms. Thompson's resignation, I was preparing numerous severance agreements for employees whose positions were eliminated or who declined a position requiring relocation to Allendale, New Jersey due to the Schick/Playtex integration. When I prepared the severance agreement for Ms. Thompson . . . I used the Schick/Playtex integration template by mistake. I should have used a severance agreement tailored to Ms. Thompson's resignation.

(Dkt. 55-2 at ¶¶ 3-5) Given these factual disputes as to whether Plaintiff voluntarily resigned or was involuntarily terminated by Defendant Energizer, the Court cannot determine whether Defendant EPAC's decision to deny severance benefits was *de novo* wrong.

---

[2] Mr. SaNogueira is Vice President of Suncare Research and Development at Playtex. (Dkt. 47-2 at ¶12)

Assuming, arguendo, that Defendant EPAC's benefits-denial decision was wrong, the Court evaluates the Plan to determine whether Defendant EPAC was vested with discretion in reviewing claims. See Doyle, 542 F.3d at 1356. The Plan provides, "a Participant's eligibility for or amount of the Severance Benefit . . . are decisions made solely within the discretion of the Company, and the Committee acting on behalf of the Company." (Dkt. 48-2 at 28-29) Therefore, the Court finds that Defendant EPAC had discretionary authority to make determinations regarding Plaintiff's eligibility for and entitlement to severance benefits. See Firestone, 489 U.S. at 112-13; see also Doyle, 542 F.3d at 1356, 1360.

Next, the Court determines "whether reasonable grounds supported" Defendant EPAC's decision, reviewing the "decision under the more deferential arbitrary and capricious standard." See Doyle, 542 F.3d at 1356; see also Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989) ("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."). The Court finds EPAC conducted a full review, considering, inter alia, an affidavit from Ms. Molitor, prepared for the purposes of the administrative appeal;[3] the Plan itself; e-mail correspondence from Plaintiff to Mr. SaNogueira; Plaintiff's letter dated February 29, 2008; Plaintiff's letter dated April 11, 2008; the Separation Agreement presented to Plaintiff on April 28, 2008; and

---

[3] (Dkt. 52-2)

15

severance plan benefits paid to other employees. (Dkt. 51-4 at 2-4) In its denial letter, Defendant EPAC opined:

> The severance agreement offered to Thompson on April 28, 2008 does not trigger entitlement to Severance Plan Benefits. First, the severance agreement's reference to elimination of Thompson's position in the integration and reduction in force was an admitted clerical error. Second, there is substantial evidence in the record –including her letter of resignation – that Thompson voluntarily resigned. Colleagues who voluntarily resign are not entitled to Severance Plan Benefits.

(Dkt. 51-4 at 4) Thus, reasonable grounds supported Defendant EPAC's decision to deny benefits on the basis that Plaintiff voluntarily resigned.

Because reasonable grounds existed to support Defendant EPAC's decision, the Court would next attempt to ascertain whether Defendant EPAC "operated under a conflict of interest." See Doyle, 542 F.3d at 1356. Where funding for a severance plan "comes directly from the coffers of a company, rather than through a trust, there is a conflict of interest[,]" and the Court must consider the conflict in determining whether an administrator's decisions was arbitrary and capricious. Yochum v. Barnett Banks, Inc. Severance Pay Plan, 234 F.3d 541, 544 (11th Cir. 2000) (applying arbitrary and capricious standard of review where an award of ERISA severance benefits by the Committee would take money directly away from the Company funding the plan); see also Doyle, 542 F.3d at 1360. The Court notes, however, that Plaintiff has not articulated any conflict of interest. (See Dkts. 39, 51) Absent some showing that Defendant EPAC's denial decision was based on a desire to avoid paying Plaintiff all remaining available Plan funds, or a substantial portion thereof, the Court places little weight on the potential conflict. Even if the Court factors in the potential conflict of interest, the Court concludes there was a

reasonable basis for Defendant EPAC's decision and that its decision should be affirmed under arbitrary and capricious review. See Jett, 890 F.2d at 1139. Accordingly, Defendants' motion for summary judgment on severance pay is **GRANTED** and Plaintiff's motion for summary judgment regarding the same is **DENIED**.

### E.     Breach of Contract – Count II

For a breach of contract claim, Florida law requires a plaintiff to plead and establish: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." Vega v. T-Mobile, USA, Inc., 564 F. 3d 1256, 1272 (11th Cir. 2009). Here, it is undisputed that the parties entered into a valid and enforceable employment contract, which provided Plaintiff an annualized gross salary of $85,000.00 and a bonus reduction buyout payment on January 1, 2008 and January 1, 2009, subject to her continued employment during those years. (Dkt. 39-2 at 11; Dkt. 47-3 at 13) What remains disputed is whether Plaintiff is entitled to the remaining two thirds of her bonus, namely $4,280.00.[4] The parties agree that whether Plaintiff is entitled to this additional payment contingent on whether she voluntarily terminated her employment or was involuntarily terminated as part of a reduction in force. (Dkt. 39 at 4; Dkt. 47 at 8; Dkt. 48 at 11-13; Dkt. 49 at 9) The Court notes that the administrator's determination on the issue of whether Plaintiff voluntarily resigned or was involuntarily terminated does not bind the parties or the Court as it relates to Plaintiff's breach of contract claim. Nor is this claim

---

[4] Plaintiff was paid the full bonus buyout of $6,420.00 on January 15, 2008. (Dkt. 48-3 at 2) On May 15, 2008, Defendant deducted the full $6,420.00 bonus from Plaintiff's check for retroactive pay, contending that she was not entitled to the bonus due to her voluntary resignation. (Dkt. 47-4 at 26; Dkt. 48-1 at 6) On September 25, 2008, Defendant paid Plaintiff a prorated bonus of $2,140.00 based on four months of service. (Dkt. 47-4 at 2; Dkt. 47-4 at 28) Thus, the amount in dispute is $4,280.00.

17

reviewable under the more stringent standard of review that applies to an administrative decision. Rather, the matter is reviewable under the standard applicable on summary judgment. Because material factual disputes exist over this issue, the Court cannot resolve this dispute on summary judgment.

Regarding Defendants' request that the Court remand the remaining breach of contract claim to state court for adjudication because "the amounts at issue in the wage claim are too small to satisfy federal jurisdiction," the Court notes the breach of contract claim is brought pursuant to diversity jurisdiction. (Dkt. 48 at 14) Because Plaintiff also requests attorney's fees pursuant to FLA. STAT. § 448.08, and there is no evidence in the record concerning the amount of attorney's fees, the Court declines to remand based on an unsupported argument that the amount in controversy requirement is not met. Accordingly, the parties' cross motions for summary judgment on the breach of contract claim are **DENIED**.[5] The parties are **ORDERED** to mediate the remaining dispute as to the $4,280.00 in alleged unpaid bonus as well as the issue of attorney's fees.

### III. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

A. Plaintiff's Motion for Partial Summary Judgment on Wages, Vacation Pay, and Bonus (Dkt. 39) is **DENIED**;

---

[5] In Plaintiff's Reply, Plaintiff withdrew her wage claim "for PTO and holiday pay." (Dkt. 49 at 8) Accordingly, this claim is dismissed by stipulation.

B. The remaining dispute as to the $4,280.00 in alleged unpaid bonus and attorney's fees is hereby **REFERRED** to mediation. Counsel for Defendants shall contact Magistrate Judge Gregory J. Kelly, in consultation with the Plaintiff, to schedule mediation on a date convenient to Magistrate Judge Kelly. If the parties are unable to resolve the dispute at mediation, the parties shall, within fourteen (14) days of the mediation, file an Amended Case Management Report setting discovery deadlines for the remaining claim for breach of contract;

C. Defendants' Motion for Summary Judgment on All Claims (Dkt. 48) is **GRANTED in part** and **DENIED in part**. Defendants' Motion is **GRANTED** to the extent it seeks a determination that Plaintiff is not entitled to severance pay under the ERISA Plan. Defendants' Motion is **DENIED** as to Plaintiff's breach of contract claim as described, supra; and,

D. Plaintiff's Cross Motion for Summary Judgment on Severance Pay (Dkt. 51) is **DENIED** in all respects.

**DONE** and **ORDERED** in Orlando, Florida, this 13th day of October 2010.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

19